J-A10002-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF C.B.K.  :  IN THE SUPERIOR COURT OF
                           :       PENNSYLVANIA
                           :
                           :
APPEAL OF: M.K.            :       No. 1993 MDA 2014

Appeal from the Decree Entered October 21, 2014
In the Court of Common Pleas of Northumberland County
Orphans' Court at No(s): Adoptee No. 28 Year of 2014

BEFORE:  GANTMAN, P.J., MUNDY, J., AND JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MAY 27, 2015**

Appellant, M.K. ("Father"), appeals from the decree entered in the

Northumberland County Court of Common Pleas, Orphans' Court, which

involuntarily terminated Father's parental rights to his minor child, C.B.K.

("Child").  We affirm.

The relevant facts and procedural history of this appeal are as follows.

Father and J.L.G. ("Mother") are the natural parents of five-year-old Child.

Mother and Father never married, but they did live together with Child for

one month after Child's birth.  Thereafter, Child resided with Mother, and

Father exercised partial physical custody pursuant to a 2010 custody order.

Although Father initially maintained regular contact with Child, Father's

involvement in Child's life dissipated.  Ultimately, Father stopped exercising

his custody rights, and he has not seen Child since December 11, 2013.

Also in 2013, Mother married J.T.G. ("Stepfather").  On July 28, 2014,

Mother and Stepfather filed a petition for involuntary termination of Father's parental rights, and a petition for Stepfather's adoption of Child. The court conducted a hearing on the termination petition on October 20, 2014. On October 21, 2014, the court entered a final decree granting Mother and Stepfather's petition for involuntary termination of Father's parental rights. The court also authorized Mother and Stepfather to proceed with adoption.

Father filed a notice of appeal on November 24, 2014.[1] The notice of appeal included a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

Father raises two issues for our review:

DID THE TRIAL COURT ERR IN DETERMINING THAT

---

[1] On December 29, 2014, Father filed a docketing statement with this Court. The docketing statement indicated that Father filed a notice of appeal on November 19, 2014 and an "amended" notice of appeal on November 24, 2014. We note the certified record does not verify the filing of a notice of appeal on November 19, 2014, but it does confirm the filing of the "amended" notice of appeal on November 24, 2014. Regarding the timeliness of the "amended" notice of appeal, "an order is not appealable until it is entered on the docket **with the required notation that appropriate notice has been given**. Where there is no indication on the docket that…notice has been given, then the appeal period has not started to run." **In re L.M.**, 923 A.2d 505, 509 (Pa.Super. 2007) (quoting **Frazier v. City of Philadelphia**, 557 Pa. 618, 612, 735 A.2d 113, 115 (1999) (emphasis in original). **See also** Pa.R.C.P. 236(b) (stating prothonotary shall note in docket giving of notice); Pa.R.A.P. 108(b) (explaining date of entry of order in matter subject to Pennsylvania Rules of Civil Procedure shall be day on which clerk makes notation in docket that notice of entry of order has been given). Here, the prothonotary docketed the final decree on October 21, 2014. The docket, however, does not show if or when the prothonotary gave notice of entry of the final decree to the parties. Therefore, the appeal period did not start to run automatically with the docketing of the decree, and we consider the November 24, 2014 notice of appeal timely filed.

[MOTHER AND STEPFATHER] PRESENTED CLEAR AND CONVINCING EVIDENCE THAT GROUNDS FOR INVOLUNTARY TERMINATION EXIST?

DID THE TRIAL COURT ERR IN DETERMINING THAT INVOLUNTARY TERMINATION OF FATHER'S PARENTAL RIGHTS IS IN THE BEST INTEREST OF THIS CHILD[?]

(Father's Brief at 6).

On appeal, Father contends he exercised his custody rights from 2010 through 2013, providing for Child's physical well-being during this period.[2] Father asserts he ceased exercising his custody rights only after Mother refused to accept his phone calls. Father maintains Mother escalated the tension between the parties by attempting to alienate Child from Father. Father alleges Mother encouraged Child to refer to Mother's paramours as "daddy," even though Mother knew the references angered Father. Father submits Mother's attempts to alienate Child from Father might have confused Child and discouraged Child from developing a more significant relationship with Father.

Additionally, Father insists he has a bond with Child. Father disputes the court's finding that Child shares a stronger bond with Stepfather, arguing:

[Stepfather] did not testify at trial regarding his relationship and his alleged bond with the child, despite

---

[2] Regarding the court's emphasis on the fact that Father is behind on his child support payments, Father claims the court ignored "the fact that [Father] is indigent, and what little income he earned went to pay his rent and child support, while [Mother] was supported by [Stepfather] and received welfare…." (Father's Brief at 21).

being present for the hearing, and the testimony of [Mother] went unsubstantiated, and the trial court did not interview the child regarding such bond.

(Father's Brief at 20). Father concludes the court erroneously terminated his parental rights. We disagree.

Appellate review in termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted).

- 4 -

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis exists for the result reached. *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. *In re R.L.T.M.*, 860 A.2d 190, 191[-92] (Pa.Super. 2004).

*In re Z.P., supra* at 1115-16 (quoting *In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Mother and Stepfather sought the involuntary termination of Father's parental rights on the following grounds:

**§ 2511.  Grounds for involuntary termination**

   **(a)   General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

      (1)   The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

      (2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*   \*   \*

>    **(b)   Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2); (b).  "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions."  **In re Z.P., supra** at 1117.

"A court may terminate parental rights under subsection 2511(a)(1) when the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least six months prior to the filing of the termination petition."  **In re I.J., supra** at 10.

>    Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.  The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his…parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

**In re B.,N.M.**, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa.

718, 872 A.2d 1200 (2005) (internal citations omitted).

"The bases for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.B.*, 990 A.2d 762, 771 (Pa.Super. 2010). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa.Super. 2002) (quoting *In re J.W.*, 578 A.2d 952, 959 (Pa.Super. 1990)). The fundamental test in termination of parental rights under Section 2511(a)(2), was stated in *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"It is universally agreed that the bond of parental affection is unique and irreplaceable." *In re Diaz*, 669 A.2d 372, 377 (Pa.Super. 1995).

> When parents act in accordance with the natural bonds of parental affection, preservation of the parent-child bond is *prima facie* in the best interest of the child, and the state has no justification to terminate that bond. On the other

hand, a court may properly terminate parental bonds which exist **in form** but not **in substance** when preservation of the parental bond would consign a child to an indefinite, unhappy, and unstable future devoid of the irreducible minimum parental care to which that child is entitled.

*Id.* (quoting *In re J.W., supra* at 958) (emphasis in original).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his…rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.
>
> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship

to the best of his…ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re B.,N.M., supra* at 855 (internal citations and quotation marks omitted). "[A] parent's basic constitutional right to the custody and rearing of his…child is converted, upon the failure to fulfill his…parental duties, to the child's right to have proper parenting and fulfillment of his…potential in a permanent, healthy, safe environment." *Id.* at 856.

Instantly, Mother testified that Father's presence in Child's life "slowly dissipated" over the course of 2013, and Father has not seen Child since December 11, 2013. (*See* N.T. Hearing, 10/20/14, at 8.) Mother denied preventing Father from exercising his rights under the parties' custody order. Mother indicated she encountered Father at a support conference on August 13, 2014, but Father did not ask about Child at that time. Although Father had provided child support in the past, Mother claimed she had not received a support payment since May 15, 2014, and Father had accrued approximately $6,000.00 in arrears. (*Id.* at 12). Mother also stated that Father has not attempted to see or call Child, and Father has not sent any cards, gifts, or letters to Child.

Mother explained Child seldom asks about Father:

> [Child] will ask about him if we drive past a place that [Father] has lived. But that's the most he's asked about him. He just asks me where [Father] is, and I just tell him that he went away, I don't know when he'll be back, but I'm sure he loves him.

(*Id.* at 19). Mother also testified that Child has a "wonderful" relationship with Stepfather, and Child refers to Stepfather as "dad." (*Id.* at 8).

Significantly, Father admitted he has not seen Child since December 2013. Father blamed Mother for his failure to interact with Child:

> Well, [Mother] filed for an emergency petition for change of custody because she heard rumors that I attempted to commit suicide, and she heard rumors that I was on drugs because of the breakup that I had with my girlfriend, that I was depressed, and I wasn't in the right state of mind to have my son. So she filed an emergency petition to modify custody, and she told me—when I called her—it was a Wednesday when I called her. I was supposed to be there to pick up my son, and I was on my way, and I called her and told her that I was on my way, and she said that I could not have him because her lawyer advised her not to let me see my son until we go to court and put something in writing….

(*Id.* at 22-23). After Mother informed Father about the emergency custody petition, Father did not attempt to contact Mother again.[3] Father claimed he could not immediately contest the emergency custody petition, because he could not afford a lawyer. Father testified that while he was saving the money to hire a lawyer, Mother and Stepfather instituted the proceedings to terminate Father's parental rights.

---

[3] Father indicated he attempted to use him family members as intermediaries with Mother. Nevertheless, Father's family members did not testify at the hearing or otherwise corroborate Father's assertions.

Father also conceded he was not currently providing financial support for Child:

> [FATHER'S COUNSEL]:    Have you been supporting your son?
>
> [FATHER]:                      I haven't.  I mean I—the only job—the only wage attachment job that I could get…I ended up getting laid off from there—well, fired.  I was told not to come back.  And every other job that I've had it's not—I'm not—I mean I don't make a lot.  And it's hardly enough just to support myself, and she won't even let me see him.

(*Id.* at 30).    At the time of the hearing, Father was employed at a waterproofing company where he had worked for approximately four months.

Based upon the foregoing, the court concluded:

> The Petition for Termination of Parental Rights was filed on [July 28], 2014.  The six months immediately preceding this date correspond with a time period during which Natural Father had no contact whatsoever with the Minor Child and provided no financial, residential, or other type of support to the Minor Child, aside from child support monies received pursuant to a wage attachment between the months of February and May.  Natural Father made no attempt to exercise any period of physical custody or visitation, and he did not contact Natural Mother for this or any other purpose.
>
> Natural Father testified that his involvement was minimal because of Natural Mother's attempts to keep the child from him. However, his subsequent testimony belies this, as he admits that he did not contact Natural Mother to arrange for periods of custody or visitation because he "…figured [he'd] be getting hung up on."
>
> \*    \*    \*

- 11 -

He opted not to pay child support after he lost the job at which he was eligible for wage attachment, despite his testimony that he subsequently found work and continues to work to this day…. He opted not to pay for half the Minor Child's preschool tuition as agreed upon by the parties.[4] He opted not to contact the Minor Child, either directly in person or indirectly by telephone. He opted to send no cards, gifts, or other communication to the Minor Child. He opted to make himself unavailable to the Minor Child for months at a time despite the fact that he resides less than 20 miles from Natural Mother's home. Put simply, Natural Father by his conduct refused to perform his parental duties in providing for the Minor Child's physical and mental well-being, and that refusal was not a result of factors beyond his control.

[4] The preschool tuition was eventually taken into account during a child support proceeding and the child support order was adjusted accordingly. …

\*     \*     \*

In fact, the Minor Child has a much stronger bond with Stepfather than with Father. The family unit in which this Minor Child has been cared for and which has provided for his physical and emotional needs and welfare is the unit consisting of Natural Mother and Stepfather. The Minor Child calls Stepfather "dad." The best interests of this Minor Child would be served by termination of Natural Father's parental rights.

(Trial Court Opinion, filed December 18, 2014 at 3-5) (internal citations to the record omitted). The record supports the court's conclusion that Father failed to provide the irreducible minimum parental care for Child and termination of Father's parental rights was in Child's best interests. **See In re Z.P., supra**; **In re B.L.L., supra**. Accordingly, we affirm.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2015